## THE STATE ex rel. PECK vs. RUSK, Governor.

*September 19 — October 10, 1882.*

STATUTE CONSTRUED. *(1) "Laborers" on construction of railroad: Powers of governor in distributing a certain fund.*
SUPREME COURT. *(2)* Certiorari *to governor?*

1. Ch. 10, Laws of 1882, revoking the grant of certain lands to the C., P. & S. Railway Co., and conferring the same upon the C., St. P., M. & O. Railway Co., provided that the latter company should pay to the governor of the state a certain sum of money to be by him expended in paying the claims of laborers, subcontractors, and material and supply men for labor and supplies done and furnished in and about the grading and other work done by or under the auspices of the former company. The governor in distributing the fund so provided construed the word "laborers," as employed in the act, as intended to designate those only who had performed manual labor in and about said work; and refused to disburse any of said fund to the members of the engineer corps or the assistant general manager of the C., P. & S. Railway Co. His proceedings having been brought before this court for review by *certiorari, held:*

    (1) That the governor correctly interpreted the act above mentioned.

    (2) That within the limits prescribed in said act the legislature had vested in the governor plenary discretion in the distribution of the fund therein mentioned, and the regularity of his action in that behalf can be questioned only by that body.

[2. Whether this court has jurisdiction in any case to send its writ of *certiorari* to the governor of the state is not here determined.]

## CERTIORARI.

This is a *certiorari* to the governor to bring here for review proceedings before him instituted under ch. 10, Laws of 1882, and his determination therein. The writ was allowed in vacation by one of the justices of this court. The governor has made due return thereto, at the same time protesting that this court has no jurisdiction to send its writ of *certiorari* to the governor of the state.

The material facts in the case, as they appear from the re-

lation and return, and from the statutes, are as follows: By certain acts of congress grants of lands were made to this state to aid in the construction of a railroad from the St. Croix river or lake to the west end of Lake Superior and Bayfield. Thereupon the legislature enacted ch. 125, Laws of 1874, by sec. 8 of which so much of these grants as could be made applicable to the construction of the line of rail-way from its intersection with the line to Bayfield, to the west end of Lake Superior, was granted to the "Chicago & Northern Pacific Air-line Railway Company." That company afterwards became the "Chicago, Portage & Superior Railway Company." The company entered into a contract with one Angle, under the name of the Angle Construction Company, for the construction by Angle of the company's entire line of railway, and Angle (or the construction company) sublet portions of the work. These subcontractors, having procured material and supplies, and having employed laborers, commenced work on the line in September, 1881, and continued to prosecute such work from each end of the line until January 20, 1882, at which time (in the language of the return) "the enterprise collapsed;" or, as the relator states it, the railway company "was unable to carry on the work longer, and abandoned the same." This collapse of the company left the subcontractors largely the creditors of Angle, or of the railway company through Angle, and largely indebted to their laborers and to the persons who had furnished them with materials and supplies. By reason of the default of the company the subcontractors seem to have been unable to pay such indebtedness. The result of this state of things was that the laborers, who were thus suddenly thrown out of employment in midwinter, without being paid for past services, and without the means of subsistence, became riotous, and the safety of the persons and property of the citizens where they were congregated was seriously menaced. In this emergency both citizens and

laborers urgently appealed to the governor for protection and relief. The governor promptly provided necessary subsistence for these men, temporarily, and by this wise and timely action prevented any serious outbreak. He then communicated to the legislature the condition of affairs, and the action he had taken. His message in that behalf, dated January 30th, will be found in Senate Journal of 1882, pp. 102–105. The legislature thereupon enacted ch. 10, Laws of 1882, revoking the grant of 1874 to the Chicago & Northern Pacific Air-line Railway Company, and conferred the same on the Chicago, St. Paul, Minneapolis & Omaha Railway Company, on certain conditions therein specified, all of which requiring present performance have been complied with by the latter company. Secs. 4, 5, and 6 of the act of 1882, which prescribe the duties of the governor in the matter under consideration, are as follows:

"Sec. 4. The said Chicago, St. Paul, Minneapolis & Omaha Railway Company shall, within three days from and after the passage of this act, pay to the governor, for the purposes, and to be disposed of as hereinafter in this act provided, the sum of $78,000; and give such security as the governor shall require to fully indemnify and save harmless the state against all liability and expenses incurred in feeding the laborers hereinafter mentioned, should the sum named in section six hereof prove inadequate for the purpose; and shall, within thirty days from and after the passage of this act, file with the secretary of state a resolution certified by the president and secretary, under its corporate seal, to have been duly adopted by its board of directors, accepting the grant upon the terms and conditions herein contained, and shall, within said thirty days, give to the state of Wisconsin such security for the completion of said railroad between said point of intersection and said west end of Lake Superior, in accordance with said acts of congress and with this act, as shall be required by the governor; and upon failure of said company

to deposit said money, or to file said resolution, or to give such security within the times hereinbefore limited, this act shall be of no force or effect whatever.

"Sec. 5. It shall be the duty of the governor to appoint immediately upon the payment to him of the money in the preceding section mentioned, some suitable person who shall forthwith investigate and ascertain the amounts honestly and actually due, and to whom due, for labor and supplies done and furnished prior to January 20, 1882, in and about the grading and other work done by or under the auspices of said Chicago, Portage & Superior Railway Company, between said point of intersection and said west end of Lake Superior, and so much of said sum so to be paid to the governor, as aforesaid, as shall be necessary therefor, not exceeding, however, in all $75,000, shall be disbursed, under the direction of the governor and with his approval, upon the report of his said agent or otherwise, as he may be best advised, in the payment and settlement of said claims. In disbursing said money the *bona fide* claims of laborers shall be first paid, and the amount which shall remain, if any, after payment of said claims of laborers, shall be applied to the payment of *bona fide* claims of subcontractors, and material and supply men, in full, if sufficient remains therefor; otherwise shall be divided *pro rata* among them, upon such basis as shall seem to the governor and his said agent just in the premises. All claims, so to be paid out of said fund hereunder, shall be presented to the governor within ninety days after the passage of this act, or the same shall be barred from participation in said fund. Provided, however, that in no case shall the assignee of any labor claim, hereinbefore mentioned, be entitled to receive out of said fund more than the amount which the governor and his said agent shall be satisfied was actually paid by said assignee for the claim so assigned and presented by him; and, provided further, that, in ascertaining the amounts due to subcontractors, as afore-

said, no claims for profits earned or prospective, on any sub-contract, shall be considered or allowed; and, provided further, that nothing in this act contained, or the payment of said money to the governor, as aforesaid, shall be taken or deemed to be an admission by the said Chicago, St. Paul, Minneapolis & Omaha Railway Company of any liability whatever for the debts of said Chicago, Portage & Superior Railway Company, or of any person or persons, corporation or corporations. Provided, further, that the said money so to be paid to the governor, as aforesaid, shall not, while in his hands, be liable to garnishment, attachment, or other legal process.

"Sec. 6. The governor shall pay, out of the moneys so to be paid him in excess of said $75,000, the compensation and expenses of said agent, and shall reimburse the state for all expenses incurred in the premises; and if, after payment of said claims as herein provided, and after payment of said expenses, there shall remain any surplus, he shall pay the same over to the said Chicago, St. Paul, Minneapolis & Omaha Railway Company."

Pursuant to sec. 5 of the act, the governor appointed Hon. C. M. Butt his agent for the purposes therein specified, who in due time made his report to the governor.

The persons employed in the engineer corps of the Chicago, Portage & Superior Railway company, to wit, the engineers, levelers, flag-men, bridge inspector, superintendents of construction and supplies, draughtsman, transitman, and the like, together with the assistant general manager of that company, presented their respective demands for services against the company to the agent, and claimed that they were entitled under the act to be paid out of the fund in the hands of the governor. These claims aggregate over $11,000. The agent reported to the governor a list of these claimants, and recommended the rejection of their claims. The following are his reasons therefor: " The superintendent of

The State ex rel. Peck vs. Rusk, Governor.

construction attended to the letting of contracts for the construction of the road, and seeing that they were complied with; the superintendent of supplies attended to getting supplies for the men at work on the road; the assistant general manager had supervisory control of the whole work; the engineers, assistant engineers, and levelers performed the ordinary work of engineering, in locating and construct-ing the railroad. I conclude, as a matter of law, that none of the parties named in the appended list are entitled to compensation under the provisions of the act referred to above, which, as I construe it, includes only manual laborers, subcontractors, and supply men. I find that the parties named performed work on the Chicago, Portage & Superior Railway, but not manual labor."

After hearing arguments of counsel, the governor decided that payment of these claims is not provided for in the act, and formally approved the report of the agent and disallowed the claims. The claimants whose claims were thus disallowed are the petitioners for a writ of *certiorari* in this proceeding, and they now move, on the petition and on the return of the governor to the writ of *certiorari* herein, for judgment re-versing the determination of the governor disallowing their respective claims.

For the relators there was a brief by *Sloan, Stevens & Morris*, and oral argument by *Mr. Sloan:*

1. This is not the case of a *certiorari* issued by this court to a co-ordinate branch of the government. The duties which the governor is invited to perform by ch. 10, Laws of 1882, are in no proper sense any part of the executive duties de-volved upon him by the constitution or by the laws enacted thereunder defining executive duties. It would have been as competent for the legislature to have designated any other state officer or any private citizen to perform this duty. The governor was not and was not intended to be invested with any discretionary power by said act, as to who should be

paid out of the fund which it creates and who should be excluded from its benefits. The legislature itself determined that, and it would be strange indeed, if, because the governor was named as the agent of the state to disburse the fund, his acts in the premises are wholly exempted from judicial supervision, and that he may pay or withhold payment from any class or any persons, clearly within the act, as his prejudice, partiality or caprice may dictate. If the relators cannot reach him by judicial process and compel him to pay what rightfully belongs to them, how can the railroad company which deposited the money, or any other person properly entitled to it, obtain any redress if he should appropriate the money to his own use? As to the distinction between an executive officer acting within the line of his constitutional duties, and performing other duties imposed by act of the legislature not pertaining to the office, see *Ayers v. State Auditors,* 42 Mich., 422, 428. 2. Even if this was an executive duty to be performed by the respondent by virtue of his office as governor, and the duty was ministerial, the weight of authority is in favor of the jurisdiction of the court. *Pacific Railroad Co. v. Governor,* 23 Mo., 353; *Cotten v. Ellis,* 7 Jones (N. C.), 545; *Ohio v. Chase,* 5 Ohio St., 528; *S. C.,* 7 id., 372; *Middleton v. Low,* 30 Cal., 596; *State v. Farwell,* 3 Pin., 393; *Gray v. State,* 72 Ind., 567; *Governor v. Nelson,* 6 id., 496; *Biddle v. Willard,* 10 id., 62; *Baker v. Kirk,* 33 id., 517; Trial of Aaron Burr, by J. J. Coombs, 41; *Marbury v. Madison,* 1 Cranch, 137; *State v. Doyle,* 40 Wis., 175. 3. *Certiorari* is the proper remedy in this matter to obtain a construction of the law. *LeRoy v. Mayor,* 20 Johns., 430; *People v. Supervisors,* 51 N. Y., 442. 4. The writ brings up the merits of the case. *Milwaukee Iron Co. v. Schubel,* 29 Wis., 444; *Swift v. Poughkeepsie,* 37 N. Y., 511; *People v. Albany,* 40 id., 154. 5. The duty which the governor is to perform is a public duty. The fund placed in his hands for distribution is raised by a public law of the state. It is

a matter of public concern that the intentions of the legis-
lature, as expressed in the act, shall be justly and lawfully
executed; that all the beneficiaries described in the act shall
receive payment according to the true intent and meaning of
the law.    It is, therefore, a proper case for the issuing of the
writ under the original jurisdiction of this court.    6. The
relators, having performed labor upon the railroad described
in sec. 5, are clearly within the act and entitled to its benefits.
The provision of that section requiring the governor to ap-
point an agent who shall ascertain the amounts "due and to
whom due for labor and supplies done and furnished   .   .   .
in and about the grading and other work," on the railroad,
controls and designates *what* is to be paid for out of the fund
provided.    The word "laborers" subsequently used in that
section was intended to describe and embrace all those who had
*performed labor* as provided in the paragraph quoted.    The
interpolation of the word "manual" as qualifying the word
"labor," is wholly unwarranted by any rule of construction.
*Stryker v. Cassidy,* 76 N. Y., 50; *Mutual Benefit Life Ins.
Co. v. Rowand,* 26 N. J. Eq., 389; *Bank of Pa. v. Gries,* 35
Pa. St., 423; *Knight v. Norris,* 13 Minn., 473; *Hovey v. Ten
Broeck,* 3 Rob., 316; *Williamson v. Wadsworth,* 49 Barb., 294;
*Cullins v. Flagstaff S. M. Co.,* 2 Utah, 219; *S. C.,* affirmed,
104 U. S., 176; *Willemetta F. T. M. Co. v. Remick,* 1 Oreg.,
169; *Capron v. Strout,* 11 Nev., 304; *Harris v. Norvell,* 1
Abb. N. C., 127; *Hill v. Spencer,* 34 N. Y. Sup. Ct., 304.
Statutes like the one under consideration have received a
liberal construction by this court.    *Hogan v. Cushing,* 49
Wis., 169; *Brown v. Hibbard,* 20 id., 326; *Winslow v. Urqu-
hart,* 39 id., 260; *Young v. French,* 35 id., 111.

For the respondent there were separate briefs by the *At-
torney General,* and by *Warner & Stevens,* of counsel, and oral
argument by the *Attorney General* and by *Mr. Warner:*

1. Neither the state nor the public are concerned in the
question sought to be raised in this case; and the original

jurisdiction of this court will not be exercised upon matters of mere private right. *Attorney General v. Railroad Companies*, 35 Wis., 519; *State ex rel. Drake v. Doyle*, 40 id., 175; *State ex rel. Cash v. Supervisors*, 38 id., 554; *State ex rel. Wood v. Baker*, id., 71. 2. *Certiorari* issues only to inferior courts or officers. The action of a co-ordinate branch of the government cannot be reviewed in this way. The scope of the writ is to be determined by the common law. No case can be found entitled *Rex ex rel. v. Rex. State ex rel. Bashford v. Barstow*, 4 Wis., 567; *Rice v. Austin*, 19 Minn., 103; *Western R. R. Co. v. DeGraff*, 27 id., 1; Cooley's Con. Lim., 41, 116; *Attorney General v. Brown*, 1 Wis., 513; *County Treasurer v. Dike*, 20 Minn., 363; *State ex rel. Thompson v. Whitcomb*, 28 Minn., 50; *St. P. & C. R. R. Co. v. Brown*, 24 id., 517; *Litchfield v. Register*, Woolw., 308; *State v. Johnson*, 4 Wall., 498; 29 Mich., 320; 34 id., 79; 27 id., 165; 38 id., 748. 3. The refusal to pay the relators' claims cannot be remedied in this proceeding but can be reached only by *mandamus*. Moses on Mandamus, 205; Graham on Juris., 326–7. 4. Such refusal was not a judicial act nor of such nature that it can be treated as a judicial act reviewable on *certiorari*. *State ex rel. Drake v. Doyle*, 40 Wis., 188. 5. The *approval* of the governor is, by the act, essential to every disbursement. *State ex rel. Martin v. Doyle*, 38 Wis., 98, 99; Perry on Trusts, secs. 250, 507, 511; *People v. Betts*, 55 N. Y., 600, 603. 6. The legislature did not intend that the relators should participate in the fund. But three classes of claimants were provided for, and the relators must rank, if at all, as laborers. But they are not such within the ordinary meaning and acceptation of that term, especially when used in connection with railroad building. R. S., secs. 1815, 4071, subd. 1; *Mundt v. S. & F. R. R. Co.*, 31 Wis., 451; *Pennsylvania R. R. Co. v. Leuffer*, 84 Pa. St., 168; *Errickson v. Brown*, 38 Barb., 390; *Aiken v. Wasson*, 24 N. Y., 482; *Coffin v. Reynolds*, 37 id., 640; *Balch v. Railroad Co.*, 46 id., 521; *Sulli-*

*van's Appeal,* 77 Pa. St., 107; *Wentroth's Appeal,* 82 id., 476; *Brockway v. Innes,* 39 Mich., 47; *Peck v. Miller,* id., 594; *Brusie v. Griffith,* 34 Cal., 302; *McCormick v. Los Angelos W. Co.,* 40 id., 185; *Whitaker v. Smith,* 81 N. C., 340; *Wells v. S. M. R. R. Co.,* 1 Fed. Rep., 270; Jones on R. R. Securities, 606.

LYON, J. Passing for the present the questions whether this court can properly send its writ of *certiorari* to the governor in any case, or, if it may do so, whether it is the proper remedy in the present case; whether ch. 10, Laws of 1882, vests in the governor discretion to distribute the fund in his hands to such laborers as in his opinion are entitled thereto; and whether this is a proper case for the exercise by this court of its original jurisdiction,— all of which have been elaborately and ably argued by the learned counsel on both sides,— we will proceed at once to consider the merits of the controversy.

The contention of the petitioners is that the word "laborers," as employed in sec. 5 of the act of 1882, is used in a general sense, and must be construed to include the petitioners, who rendered services in the construction of the railway between the designated points. On the other hand, counsel for respondent maintains that the word is employed to designate those persons only who did manual labor in and about the grading and kindred work, in the construction of the railway. The agent found that the relators did work on the railway, but not manual labor, and therefore advised the rejection of their claims. The governor based his disallowance of the claims on somewhat broader grounds. To give an accurate idea of his views, the following paragraphs are copied from his return. After stating that he and his agent heard arguments for and against the claims of the relators, and that counsel stipulated that they "could and should take notice, without proof, of the facts and circum-

stances attending said act, and relating to the condition of affairs when the same was passed," the return proceeds as follows:

"That the construction of the line of the Chicago, Portage & Superior Railway Company had been let as an entirety to one Angle, who, under the name of the Angle American Construction Company, had sublet a portion of the work in sections to various parties — subcontractors — and those parties had procured the necessary laborers, material, and supplies, and had partially completed the line from each end, when the enterprise collapsed on the 20th day of January, 1882. These laborers, not having received any wages, except for part of November, 1881, were without the means of subsistence or of removing elsewhere, and they were then being subsisted either by the subcontractors or by the state, and were in a riotous condition. That it was not at any time claimed before me, or my said agent, to my knowledge, nor did it appear in any way, that the relators, or any of them — engineers — had rendered any service further or otherwise than such as appertains to the engineering corps of a railway company in locating the line and in preparing the plans for and estimates of the work done, or that they, or any of them, ever did any grading, or anything like it, or answering the same purpose, or that they ever laid any ties or rails. That in refusing to disburse any of the fund referred to in said act, to the relators, and in approving said report of my said agent, I acted upon all said facts and circumstances, and under the opinion that said act was designed to provide: *First*, for the railroad laborers, as that expression is commonly understood; *second*, for the *sub*contractors, material and supply men, to the total exclusion of the engineer corps, as well as the officers and agents of the railway and construction company, and the contractor, Mr. Angle, and that any other construction of the act would render it very unjust and unreasonable, as well as absurd, in view of the amounts of said classes of claims respectively."

Of course the word "laborer," as employed in sec. 5, must be interpreted in the sense in which it is ordinarily used and understood, when applied to men engaged in constructing railways, unless some other interpretation is clearly indicated in the act itself. The governor decided against the relators, on the hypothesis that, in common parlance, engineers and members of engineer corps, inspectors, superintendents, managers, and other officers and agents of a railway company, engaged in the construction of its railway, are not denominated laborers, but those only are so called who perform manual labor in the construction of the railway upon the road-bed and track, or some other similar labor to the same end. In the light of common observation and experience, it would be difficult, we think, to demonstrate that the hypothesis is false. Again, the act makes no provision for the relief of the Chicago, Portage & Superior Railway Company, or of Angle, the original contractor. How far one or the other was responsible for the failure of the company, and the disastrous results which followed such failure, does not appear. But the whole scope of the law of 1882 shows that the legislature ignored them entirely, and framed the law in the interest and for the benefit of their victims. Chief of these were the subcontractors, and through them their creditors, the laborers and the supply and material men. This feature of the law strongly corroborates and sustains the construction given it by the governor. Then, again, the law specifies subcontractors, supply men, and material men, as beneficiaries of the fund in the hands of the governor, but fails entirely to specify any class which unmistakably includes officers and agents of the company, or of the original contractor, Angle. This omission is not without significance, for had the legislature intended to include these, it is fair to assume that some language would have been employed to express that intention, instead of leaving it to doubtful and uncertain inference; that something more explicit than the word "laborers" would be

found in the act to manifest such intention. The omission is the more significant if it be true (as asserted in argument, and not denied), that an amendment to the bill which resulted in ch. 10, was proposed in one branch of the legislature, providing expressly for the payment of the petitioners' claims, and was voted down.

Now, when it is considered that the governor was perfectly familiar with all the circumstances which gave rise to the act of 1882, and had the best possible means of knowing just what the act was intended to accomplish; and when it is considered farther that the language employed in the act admits of the construction he gave it, we should hesitate to say that he construed it incorrectly. But there is one clause in the law itself which satisfies us, beyond any reasonable doubt, that the governor construed the law correctly. We first find the word "laborers" in the act in sec. 4. That section requires the Chicago, St. Paul, Minneapolis & Omaha Railway Company to give security to indemnify the state against expenses, etc., " incurred *in feeding the laborers hereinafter mentioned.*" The next mention of "laborers" is in sec. 5, in which provision is made for paying them. The specification in sec. 4, referring as it does to sec. 5, limits and defines the word "laborers" in the latter section. By necessary implication, the word in that section must be construed to mean only the class of laborers who had been theretofore subsisted by the state — that *is,* to *those laborers who had* been at work for the subcontractors in the construction of the railway, for none others were so subsisted. Of course, this construction excludes the relators from participation in the fund in the hands of the governor.

We conclude that the governor interpreted the act of 1882 correctly.

We are also of the opinion that, within the limits prescribed in the act of 1882, the legislature intended to vest in the governor plenary discretion in the distribution of the

fund in his hands, and hence that the regularity of his action in that behalf can only be questioned by the legislature. If he has done injustice to the petitioners, they must look to the legislature alone for relief. So far as the courts are concerned, the distribution is just as binding as though the legislature had made a specific appropriation to each person to whom the governor has distributed the fund, of the amount allowed each respectively. We are impelled to this conclusion upon careful consideration of the history, language, and general scope of the act of 1882. The fund in the governor's hands, although provided for by the legislature and under its absolute control, was in no correct sense the property of the state. It was not paid to the governor by the railway company for the use of the state, but for the use and benefit of certain classes of individuals, and was a mere gratuity. The legislature did not send it to the state treasury to be paid out in due course on the audit and warrant of the secretary of state, whose acts the courts may review by appropriate process; but it placed the fund in the hands of the governor. It designated the classes to whom the same should be paid, and conferred upon him most ample authority to determine who were entitled under the law to share in the distribution, and the amount justly payable to each. For want of detailed information the legislature could not distribute the fund, so it imposed the duty and conferred the power upon the governor to obtain the necessary information and make the distribution accordingly, leaving him free to rely upon the report of his agent, or to resort to any other source of information within his reach. It seems to us that his determination is as conclusive upon the courts as would have been the action of a legislative committee charged with the same duty and clothed with the same powers. Of course, no one will contend that this or any other court could send its process to such a committee, or in any manner review its determination. But we do

not care to discuss the question farther, because the view we have taken of the merits of the controversy renders the determination of the question quite immaterial.

The writer of this opinion allowed the writ of *certiorari* herein in vacation, without any investigation of the merits of the petitioners' claim, and with grave doubts whether this court had jurisdiction to send its process to the chief executive officer of the state — the head of a co-ordinate department of the state government. The writ was allowed in the expectation that the question of jurisdiction would be raised by a motion, in advance of a return, to quash or supersede the writ, and it was thought that the petitioners were entitled to be heard on that question. The governor has seen fit, however, to make return to the writ, and has contented himself with a protest against the jurisdiction of the court. The question of jurisdiction has been ably argued, but we have thought best to give our opinion on the merits of the controversy, and the conclusions we have reached relieve us from the necessity of passing upon that question. We therefore leave it undetermined, and will only remark that this court has not, and will not in any case assume jurisdiction to review the acts of a co-ordinate department of the government, unless the duty and power to do so are clearly imposed and conferred upon it by the constitution and laws.

The motion for judgment must be denied.

*By the Court.*— Motion denied.