ANTONIO ROMERO MORENO, Petitioner, *v.* ROBERT H. GORE, GOVERNOR OF PUERTO RICO ET AL., Respondents.

No. 287. Argued December 11, 1933.—Decided March 29, 1934.

*Guerra Mondragón & Soldevila* for petitioners. *Benjamin J. Horton, Attorney General,* and *Tomás Torres Pérez, Assistant Attorney General,* for respondents.

MR. JUSTICE CÓRDOVA DÁVILA delivered the opinion of the court.

In this case application has been made to this court for a writ of mandamus to compel the reinstatement of the peti-

tioner in the position of engineer of the Public Service Commission from which position, it is alleged, he has been arbitrarily removed. At the time the fact stated in the petition took place, Hon. Robert H. Gore was Governor of Puerto Rico and Mr. Eugenio D. Delgado was president *pro tem.* of the Public Service Commission. Both these officers having ceased as incumbents of their respective offices, the suit has been continued on motion of the petitioner, in so far as it seeks the reinstatement of the petitioner, against Governor Blanton Winship and the titular President of the Public Service Commission, Miguel A. Muñoz.

It is alleged by petitioner Antonio Moreno Romero that he has been in the Civil Service of Puerto Rico since September 10, 1917, and that he is included in the classified service thereof by virtue of his appointment as engineer made by the Civil Service Commission on July 1, 1921. The salary of said office is $3,800 and has been authorized and provided for by the Legislative Assembly of Puerto Rico under Act No. 59 of 1933, entitled "An act making appropriations for the necessary current expenses of carrying on the Government of Puerto Rico for the fiscal year ending June 30, 1934."

On October 18, 1933, the petitioner received the following letter:

"Mr. Antonio S. Romero, Engineer,
Public Service Commission,
San Juan, Puerto Rico.

My dear Mr. Romero:
The Governor of Puerto Rico has written to the Chairman of the Public Service Commission under date of the 16th inst. a letter which reads as follows:

'I am interested in reducing in so far as possible any and all expense which is not absolutely essential in the proper operation of the government business.

'As a matter of administrative economy I consider it necessary to abolish the positions of engineers in the Public Service Commission and henceforth this work will be done by engineers from the Department of the Interior.

'You are accordingly notified that effective November 1st any engineering work required by the Public Service Commission will be assigned to the Department of the Interior, thus eliminating the necessity of employment of engineers by the Public Service Commission and you are hereby directed to eliminate on that date the following positions in the budget of the Public Service Commission:

| | |
|---|---|
| 1 Engineer | $3, 800 |
| 1 Engineer (Electrical) | 2 700.' |

As you are one of the engineers mentioned in the said letter, this serves as a notice that on and after November 1st your position is abolished and your services no longer required.

This I am bound to do in compliance with the instructions contained in the letter from the Governor above quoted.

Very truly yours,

(Sgd.) Eugenio D. Delgado,
President *pro tem.*"

It is further alleged that the action and step taken by the respondent Robert H. Gore to abolish in an unlawful, unjust, and arbitrary manner the aforesaid position is tantamount to a dismissal and removal of the petitioner and is due to a preconceived plan, publicly announced beforehand and later put into operation by Robert H. Gore, either personally or through the various heads of departments, to remove from office all officials and employees who may belong to the political party of which petitioner is a member.

This court, after hearing the parties in interest, issued an alternative writ of mandamus directed to the respondents, who, at the hearings held on December 11 and 12, 1933, submitted the grounds for their claim to be released from any responsibility. Having heard the evidence offered by both parties the case was submitted for our consideration on written briefs.

Three are the fundamental questions which at first sight appear from the pleadings and the evidence in the present case. The first refers to the power of the Governor to transfer or assign a bureau or office of the Insular Government

to any department thereof while the Senate is not in session; the second is whether the power to transfer or assign includes also the power to abolish; and the third, whether or not the bad faith attributed to the Governor in ordering the abolition of the position of the petitioner has been established by the evidence.

The respondents do not impugn directly the doctrine that when the Governor acts outside the scope of his functions and violates a private right he is amenable to the jurisdiction of the courts who are bound to protect such right; but this doctrine is extensively discussed by the petitioner in his brief and apparently questioned by the respondents. In *Lutz* v. *Post,* 14 P.R.R. 830, this court held that a writ of mandamus lies against the Governor in a proper case, and this holding was confirmed in *Jiménez* v. *Riley,* 30 P.R.R. 582. Notwithstanding that the question is a closed one for us, we shall quote from the opinion rendered by the Supreme Court of Wisconsin in the case of *Ekern* v. *McGovern,* 142 N. W. 595, certain excerpts which, although they do not specifically discuss the propriety or the impropriety of a writ of mandamus directed to the Chief Executive, apply general principles relating to the jurisdiction of the courts in those cases in which the Governor, arbitrarily commits illegal acts and exceeds his legal powers. In the case cited, decided by the Supreme Court of Wisconsin, the Governor hastily dismissed a high official without granting him a reasonable time for making a defense and appointed his successor. The removed officer did not abandon the functions of his office, and when the incumbent appointed by the Governor attempted to forcibly enter the premises in order to take possession, a writ was applied for and obtained from the court, protecting the dismissed officer from being forcibly interfered with in the possession of his office. Counsel for the parties argued extensively the question involved. The Supreme Court of Wisconsin rendered a vigorous opinion, full of lucidity and wisdom, which distinguishes and commends itself

for the purity of the principles laid down therein and which discusses with breadth of view and luminous concepts the power of the courts to protect the rights of all citizens whenever violated, regardless of the official rank of the person responsible for such violation. From the opinion of the court in that case we quote as follows:

"In the foregoing, as we have already sufficiently indicated, it is not doubted that the Governor, within the scope of his authority, is beyond the reach of the courts, but a violation of private rights, we reiterate, is not within such scope, and when that occurs by him or his agents the wronged party may appeal to the courts of his country for redress.

"As said by this court in *Attorney General* v. *Barstow*, 4 Wis. 742, so long as the court merely proceeds 'in the discharge of its appropriate duty of determining and settling the rights of parties, and not creating these rights, then it must go forward to judgment, however unpleasant and delicate a duty that may be, and regardless of any and all consequences that may result from its constitutional action. . . . Here we must firmly stand to our posts of public trust, until the Constitution fall about us in ruins.' Those words, evincing a lofty conception of judicial duty and courage to do it, after the lapse of over half a century in the history of this court might well be repeated with emphasis. The idea so eloquently phrased by Justice Cole in those early days, and on that memorable occasion in the court's administration, is no less pervading here now than then. Notwithstanding assaults upon it then or since or now, upon the theory of a sort of kingly authority vested in the executive department, enabling the one chancing to be there to infract the law and be so above the agency of the people to remedy and prevent wrongs by applying the law, that any attempt to question his acts by such agencies would be usurpations—it has been and is now no more in danger than 'a star in maw of the clouds.' It is grounded on the sovereignty of the people vitalized by a constitutional appointment of the judicial department to vindicate it.

"How can one be familiar with *Atty. Gen. Bashford* v. *Barstow* and doubt, for a moment, that the Governor, as a violator of law, stands no different than any individual? Arguments similar to those we have heard to the contrary in this case were made then with a logic, eloquence and force unexampled before in this court and never equaled since. There the record stands,—an inexhaustible fountain

of wisdom on the subject discussed. All the actors at the bar realized that they were engaged in a contest which was to settle for all time in this state the underlying principles of our governmental system—settle them untrammeled by any false notion which had obtained elsewhere under the misconception that foreign systems furnished a model for it. They were too near the time and circumstances of origin to need to look for precedents. In fact there were no precedents. They were familiar with the systems of the ancients. They knew the purpose of the builders here was to displace it. In the light of the monumental purpose and with the experience which the official expounders themselves gained in making our Constitution, there was wrought out and pronounced a result which no one need misunderstand.

"How the sentiments leading up to and characterizing the final result in *Bashford* v. *Barstow* grow as we contemplate them, and fill the soul with admiration for our form of government, and gratitude to those who placed its dominant principles on such an enduring foundation. Some of those sentiments, in the language of that day, may well be repeated here as best voicing our own conception.

"  *      *      *      *      *      *      *

"It is somewhat strange that, notwithstanding the real logic of the change effected by the declaration and successful conflict for independence on our shores, courts sometimes seem to have failed in appreciation that it was independence of the system of government characterized by individual possession of mere privileges emanating from personal sovereign, which was declared for, fought for and won in the smoke and din of battle and by the sacrifice of blood and treasure,—a substitution, for the old system, of one based on inherent individual rights, recognizing nothing in the nature of sovereign authority but that inherent in the people and delegable by the people to co-ordinate departments in such manner as the people might see fit, coupled with constitutional restrictions and guaranties.

"Notwithstanding the light of the old notion of personal sovereignty and the system upon which it rested was extinguished in the struggle characterizing the birth of the new system on our shores, which arose in all its unspeakable beneficence from the ashes of the old like the beautiful flower from the ashes of Hyacinthos, and has ever since pervaded the land and is fast extending its blessings to include all mankind, the old, like Banquo's ghost, appears in apparition from time to time, called forth, as it were, from the human tendency—product of heredity—reaching back through the ages—to

bow at a personification of personal sovereignty. It would be most lamentable if such false conception should find any place in our jurisprudence after the early most emphatic rejection of it, and the frequent affirmances of such rejection.

"We do not fail to note, at this point, the personal expression of doubt in *State* v. *Rusk,* 55 Wis. 465, 479, 13 N. W. 452, as to the competency of the court to send its writ to the Governor of a state or in any way review his acts. But it was not an authoritative saying. It was a mere passing and wholly personal, and, we are constrained to think, rather inconsiderate remark. It is well to eliminate it, expressly, from having a cast of judicial decision.

"It must not be understood that there is any want of appreciation here of the fact that much deference is due to the co-ordinate department of the government, vitalized by the Governor. It is the pleasure and the duty of the courts to pay that deference, and, perhaps, to resolve reasonable doubts as to where mere deference ends, in favor of the executive department. But the court must not go so far as to cast any doubt upon its own authority to deal with all judicial questions, regardless of whether it may necessarily call in question some act of the Governor. It may very properly hesitate, and even decline, to use its authority in any coercive way as to him, where there is any measure of discretion to do so, but not even venture to doubt that it possesses the power to act when action is necessary. No one can tell how soon action may be necessary to stay the hand which might accomplish most serious mischief, as was the case giving rise to *Attorney General* v. *Barstow.*

"Some courts have given the weak excuse for doubting their rights to send a writ to a Governor, directly or indirectly questioning his executive act, that the court might be powerless to enforce obedience—even suggesting the possibility of executive control of the militia having to be contended with; as if a court with knowledge of its constitutional authority would be justified, under any circumstances, in not using it merely because the one who would be otherwise acted upon, even though he be the chief conservator of the law, might commit treason, as it were, rather than submit to duly constituted authority. This court has never yet acknowledged the existence of either the want of power to enforce its writs, or want of courage to vindicate it.

"Judges of great eminence and text-writers the most learned have discoursed along the same line as the foregoing. Justice Field speaking for the court in *McCauley* v. *Brooks,* 16 Cal. 39, said this:

There is nothing in this distribution of powers which places either department above the law, or makes either independent of the other ... There is no such thing as absolute independence.' And further, in effect, where power, is given a department, it is to be implied that there is independence within the scope thereof. If it oversteps its line the judiciary will vindicate the violated right.

"For a further example of the many illustrations in the books of what has been said, Justice Valentine speaking for the court in *Martin* v. *Ingham,* 38 Kan. 641, 17 Pac. 162, thus expounded the constitutional system:

" 'There is no express provision in the Constitution, nor in any statute, exempting any member of the executive department, chief or otherwise, from being sued in any of the courts, . . . and if any one of such officers is exempt . . . it must be because of some hidden or occult implications of the Constitution or the statutes, or from some inherent and insuperable barriers founded in the structure of the government itself . . . In all other cases it is not the rank or character of the individual officer, but the nature of the thing to be done, which governs. No other officer is above the law . . . The different departments of the government are not independent of each other . . . It is said that if the Governor opposes the order or judgment of the court, it cannot be enforced. . . . But are the courts to anticipate that the Governor may not perform his duty? . . . No one should suppose that he would fail to perform his duty . . . No department should ever cease to perform its functions for fear that some other department may render. its acts nugatory... Each of the different departments...is superior to the others in some respects . . . Each department in its own sphere is supreme. But each outside of its own sphere is weak and must obey.'

"Courts which hold contrary to the foregoing, as said by some text-writers, do so without any sound basis for their conclusion. They do so, as before indicated, largely from a false conception of the system of which they form a part."

The Supreme Court of Wisconsin does not stop there. The opinion is long and we do not think that the paragraphs above quoted are superior to those which we have omitted. The law does not empower the Governor to act arbitrarily. On the contrary, it lays upon him the duty to obey its mandate and the responsibility for its faithful execution. It

makes no diffierence that the Governor acts under color of authority: if his actions are found to be clearly arbitrary the courts of justice are bound to say, at the instance of an aggrieved party, the last word and to remedy the wrong inflicted even though the latter may emanate from the highest governmental spheres. It is true that this function is highly unpleasant and that the courts should be moderate and cautious in the use of their judicial powers, to avoid encroaching upon the authority of the Executive when exercised within the limits of its jurisdiction. But justice, which knows no caste or rank, must, whenever necessary, re-establish violated rights and, proceeding equitably and serenely, inflexibly and magnanimously, extend its protective arms equally to all the citizens—to the humble as well as to the powerful, to him who wears a humble garment as well as to him who carries on his shoulders the robe of high magistracy. As the Wisconsin court has said, no officer is so high as to be above the law nor so low as to be outside the protection of its provisions.

Referring to the argument in the case of *Attorney General ex rel. Bashford* v. *Barstow,* 4 Wis. 742, commented upon in the excerpts from the opinion which we have quoted, the court above mentioned says:

"With inimitable power of logic the proper place of the judiciary in our system and importance of maintaining it was pressed upon the attention of the court to nerve it to the uttermost in solving the controversy—these inspiring words being indulged in from the bar: 'When discontent, violence and anarchy shall succeed to law and order,—when the people and public officers shall depart from the Constitution and desert the ship of state, I have a hope that the last glimpse that will be caught of organized government will be the judiciary,—that courts may be seen as long as any vestige of a state shall remain, still ready to direct,—still speaking the law with an even mind, dispensing justice with an even hand, sitting serene and unmoved above the influence of fear and of faction, still abiding by that motto so peculiarly their own,—*Fiat justitia, ruat coelum.*' "

This eloquent appeal to justice, wherein the beauty of the language used is on a parity with the high sentiments expressed, is enlarged and complemented by the following exalted words from the same Wisconsin tribunal:

"We must remark, in closing, that we have not been unmindful at any time of the regard which this court should have for the high office of Governor. A solemn duty rests here in that regard. It is a matter of great delicacy to deal with the Governor's action and condemn it as void, but when duty requires it the duty must be performed. Any one who would hesitate when the duty is plain, because of the exalted station of the co-ordinate department of government, is unworthy to be a trustee of the judicial power delegated by the people. With due deference to the co-ordinate department, and full appreciation of its independence within the scope of its authority, we must, with the courage which should characterize the supreme judicial office, vindicate the paramount authority here to determine what the law is, what acts constitute a violation thereof, and what are the legal consequences. The moment it shall be established that either of the other deparments is independent of the judiciary in that field, the guard which the people placed in the Constitution to conserve private rights will have been broken down and the pathway for usurpation will be open and plain. We entertain no thought that the Governor had any purpose to violate the law. He is human, and so is liable to err. Error often occurs, as we think it did here, without consciousness of any ulterior influence, and yet some strong feeling, springing from provocation, may so have had the field as to subvert the judgment."

The question of whether or not the Governor has the power to transfer or assign a bureau or office to any department while the Insular Senate is not in session deserves special attention. Section 53 of our Organic Act provides as follows:

"That any bureau or office belonging to any of the regular departments of the Government, or hereafter created, or not assigned, may be transferred or assigned to any department by the Governor with the approval of the Senate of Puerto Rico."

The respondents contend that in this case the Governor must have the same power which he exercises when filling

any vacancies through appointments made while the Senate is not in session. The respondents apparently start from the premise that the Governor would have the power to fill the vacancies which may occur during a recess of the Senate, even in the absence of a statutory provision granting him such power. We do not know whether this question has been passed upon by the courts. We do know what were the causes which gave rise to the power granted by the Federal Constitution to the President to fill vacancies while the Senate is not in session. The clause so providing was not a part of the first draft of the Constitution, but was inserted afterwards through an amendment apparently without objection.

In regard to this power granted to the President, Story in his "Commentaries on the Constitution of the United States," vol. 2, p. 380, sec. 1157, says:

"The propriety of this grant is so obvious that it can require no elucidation. There was but one of two courses to be adopted : either that the Senate should be perpetually in session, in order to provide for the appointment of officers; or that the President should be authorized to make temporary appointments during the recess, which should expire when the Senate should have had an opportunity to act on the subject. The former course would have been at once burdensome to the Senate and expensive to the public. The latter combines convenience, promptitude of action, and general security."

Watson, in his treatise on the Constitution (vol. 2, p. 993), says:

" 'But it was obvious that without some provision for temporary appointments to fill up vacancies which might happen while the Senate was not in session to participate in making appointments, grave inconvenience and harm to the public interest would ensue. To meet this difficulty it was by common consent provided that— "the President shall have power to fill up all vacancies that may happen during the recess of the Senate, by granting commissions which shall expire at the end of their next session." This is essentially a proviso to the provision relative to appointments by and with the advice and consent of the Senate. It was carefully devised so as to accomplish the purpose in view, without in the slightest degree

changing the policy of the Constitution, that such appointments are only to be made with the participation of the Senate. Its sole purpose was to render it certain that at all times there should be, whether the Senate was in session or not, an officer for every office, entitled to discharge the duties thereof.' "

The amendment introduced to the first draft of the Constitution shows that the authors of this historic document did not believe that the power granted to the President to nominate and appoint officers with the advice and consent of the Senate authorized him to fill the vacancies which might occur during the recess of said legislative body. Had they so believed they would not have added a supplemental provision to fill the lagoon noted in the first draft. We do not know of, nor do we think there is, any State where the power to fill vacancies during the recess of the Senate has not been granted by law. All the authorities and the decisions which we have studied on this question invariably make reference to some provision granting to the Executive the power to fill vacancies while the Senate is not in session. In Puerto Rico the appointments made by the Governor by and with the advice and consent of the Senate are authorized by special laws and by section 167 of the Political Code. Section 26 of our Organic Act provides that the appointments made while the Senate is not in session shall be effective either until disapproved or until the next adjournment of the Senate for the session.

The respondents have cited no precedent tending to show that the Governor has the inherent power to fill the vacancies which might happen while the Senate is not in session. This argument, far from favoring the respondents, weakens their position since they have not demonstrated that the Executive has the implied power to fill vacancies during the recess of the Senate as incidental to the power of appointment. In our view the Governor can not exercise the power granted to him by section 53 of our Organic Act disregarding the consent of the Insular Senate. It is necessary that such consent

should be given in order that the transfers or assignments authorized by law may become effective.

The second question before us is whether or not the power granted to the Governor to transfer or assign a bureau or office to any department of the Government includes also the power to abolish these administrative agencies with or without the consent of the Senate. If he has no power to transfer, it is clear that he has no power to abolish. The abolition of an office implies its disappearance, its complete inexistence, its destruction. Even assuming, for the purposes of the argument, that the Governor has the implied power to fill vacancies during the recess of the Senate, without it being so provided by law, it would be necessary to strain the argument and do violence to the canons of judicial interpretation in order to reach the conclusion that section 53 of our Organic Act impliedly authorizes the abolition of an office and that this authorization extends to the period while the Senate is not in session.

When a vacancy is filled the Governor does not destroy rights, he rather creates them, and nothing is lost by waiting for the regular session of the Senate to approve or disapprove the appointment; but when the action of the Executive has the effect of depriving an officer of his employment, the rights of such officer can not remain uncertain, subject to the eventuality of the Senate approving or disapproving at its regular session what the Governor may have done. We are of opinion that the Governor has no power to order the abolition of an office, especially while the Senate is not in session, for if he has no power to order a transfer during that period much less will he have it to exercise an act of much greater consequence such as the act of abolition.

In his letter to the President of the Public Service Commission, Robert H. Gore states that as a matter of administrative economy he deems it necessary to abolish the offices of engineers in the Public Service Commission and directs that officer to eliminate the salaries of both the aforesaid

offices in the budget of the Public Service Commission. We have seen that the Governor may transfer or assign to any department an entire bureau or office.

Blackstone defines the word "office" as a right to exercise a public function or employment, and to take the fees and the emoluments thereunto belonging. At page 25 of his treatise on the "De Facto Doctrine," Judge Albert Constantineau says:

"The American definitions are exceedingly numerous and varied in language, though, as a rule, not widely differing from one another in substance. 'An office,' says Chief Justice Marshall, is defined to be "a public charge or employment," and he who performs the duties of the office, is an officer.'

"A public office, as defined by the New York Court of Appeals, is 'a permanent trust to be exercised in behalf of the government, or of all citizens who may need the intervention of a public functionary or officer, and in all matters within the range of the duties pertaining to the character of the trust. It means a right to exercise generally, and in all proper cases, the functions of a public trust or employment, and to receive the fees and emoluments belonging to it, and to hold the place and perform the duty for the term and by the tenure prescribed by law.' A public office has also been said to be 'an agency for the state, and the person whose duty it is to perform this agency is a public officer.'"

The communication from the Governor eliminates the offices of engineers in the Public Service Commission and directs that the work connected thereto be henceforth performed by engineers from the Department of the Interior. So that the office disappears while the services, which is the only thing in effect transferred, continue. The order of the Governor does not have the effect of transferring or eliminating the office quarters or location where the petitioner keeps his desk, bookcases, and reference library. The order eliminates or destroys the office, and it only transfers the services connected therewith. We do not believe that it was the intention of Congress to grant to the Governor the power to abolish an entire bureau or office when authorizing him to make transfers. We can not conclude that this is a power

implicit in the power to transfer. The Legislature, of course, may vest the Executive with authority to abolish an office and it is a general rule that bodies with power to create public offices have also the power to abolish them. But as the Legislature is the fountain where all these powers originate, we must resort to it in order to determine whether in a particular case the power invoked derives from some legislative provision.

Lastly, the Governor is charged with a preconceived plan to dismiss all officers and employees belonging to the party of which the petitioner is a member,—the Liberal Party (*"Partido Liberal"*). It is a fact admitted by the parties herein that Mr. Romero belongs to the classified civil service. According to section 6 of the Civil Service Act, approved in 1931, the petitioner could be removed from his office only after compliance is had with the provisions of that act. No person holding an office or place in the classified civil service shall be removed or discharged except for just cause, upon written charges, and after an opportunity to be heard in his defense. The act provides for the reinstatement of an officer or employee who has been removed where it appears after a proper hearing that the removal was made for political or religious reasons.

The eighteenth paragraph of section 2 of our Organic Act provides that no political or religious test other than an oath to support the Constitution of the United States and the laws of Puerto Rico shall be required as a qualification for any office or public trust under the Government of Puerto Rico.

It is evident that if no political or religious test may be required as a qualification for filling a public office, the person filling such an office may not be removed therefrom by reason of his political or religious ideas. In the present case it does not appear that the Governor dismissed the petitioner from his office, but that he ordered the abolition of the latter. It is alleged, however, that this abolition was due to a pre-.

conceived plan to remove all officers belonging to the party with which Mr. Romero is affiliated. Of course, if the action of the Executive, instead of being prompted by a desire to effect economies as stated in the letter addressed to the President of the Public. Service Commission, was due to other reasons having in view the removal of the petitioner, then such abolition amounts to a deliberate removal.

In *Gil* v. *Chardón,* 41 P.R.R. 208, this court speaking through Mr. Chief Justice del Toro said:

"The mere just and modern tendency and the spirit of the act creating the civil service are to guarantee the efficiency of the public service through establishing and maintaining a competent, industrious and honest corps of employees not subject to the changes, fickleness and prejudices of politics, or the animosity, arrogance and selfishness of political leaders, but dependent upon itself and upon its own behavior in the exercise of its functions. To fulfill his duty—such should be the standard of the employee. And if he does it, to feel sure in his employment—this to be the guaranty of the law which, if violated, must be enforced by the courts of justice."

Let us consider now the evidence introduced by the petitioner to prove his allegation that the Governor acted under the impulse of political reasons. The evidence starts with a telegram addressed to the Honorable Robert H. Gore by the President of the Liberal Party (*"Partido Liberal"*), Antonio R. Barceló. In this communication Mr. Barceló withdrew a list of names which he had submitted to the Governor to be considered in connection with the appointments of heads of departments and gave as his reason for withdrawing said list that there had been published in the newspapers a statement by the Governor to the effect that he would ask the members of his cabinet appointed by him to submit beforehand their resignation with the date thereof in blank. Mr. Barceló added that no Puerto Rican of high standing or prestige could accept an office under such conditions. In his reply to this message the Governor offered to comply with the wishes of Mr. Barceló and stated that neither he nor the members of the Liberal Party could complain because of a

strict compliance with such wishes, adding that he supposed that Mr. Barceló would not want to retain such posts as were then occupied by Liberals. The Governor concluded with the statement that the participation in the government that might have been shared by the Liberal Party would be tendered to the Democratic Party.

Witness Arturo de la Cruz Calderón, reporter for the newspaper "La Democracia," testified that one afternoon, in the course of an interview with press correspondents, the Governor stated, with reference to the message sent to him by Mr. Barceló withdrawing the names of Liberal candidates which appeared on the list previously submitted, that the first who ought to resign their positions in the government were his son-in-law—meaning Mr. Romero, a son-in-law of Mr. Barceló—and Mr. Font, because they were Liberals; that if that was the way the Liberals thought about the blank resignations, if that was how Mr. Barceló felt, Mr. Romero and Mr. Font should resign; whereupon one of the persons present remarked that Mr. Font and Mr. Romero should not resign because they did not owe their appointments to the Governor nor were they members of the cabinet.

Mr. Miguel A. Muñoz, President of the Public Service Commission, testified that on one occasion when he called on the Governor to apply for a leave of absence and to ask to be allowed to absent himself on a trip to the United States, the latter said to him: "You have two Liberal engineers in the Commission; I do not want a single Liberal in it. I want you to ask Romero for his resignation." According to Mr. Muñoz, he refused to comply with the request of the Governor, and said that he could not ask for the resignation of Mr. Romero, who was in the civil service, had served for 14 or 15 years in the Commission, and who was very competent; that there were no reasons why the Commission should ask for his resignation and that he failed to see why the Governor should ask for it, except that Romero was a son-in-law of Mr. Barceló. Upon his return from the United States, Mr.

Muñoz called on the Governor to ask him to reconsider his order abolishing the offices of engineers in the Commission. This took place in Mr. Saldaña's presence. The Governor said: "You remember that I spoke to you about the matter of the engineers." Mr. Muñoz replied: "No, you did not mention to me the matter of the engineers; you spoke to me only about the case of Mr. Romero; that his resignation had to be requested and I told you that rather than do this, I would resign."

Mr. Eugenio Delgado, who was president *pro tempore* of the Commission at the time the Governor wrote his letter ordering the abolition of the office filled by the petitioner, testified that the Governor called him to tell him that he was surprised that Mr. Muñoz, the titular president, had failed, before he left, to comply with his request to ask for Mr. Romero's resignation; that the Governor had called him to inquire whether Mr. Romero continued rendering his services, and that, upon his answering affirmatively, the Governor asked him if he did not know that he had requested Mr. Muñoz to ask for the resignation of Romero, to which he replied that he knew nothing about it; that then the Govenor said: "Well, I must have you ask Mr. Romero to resign"; that the witness replied that it was idle to do so because Mr. Romero was in the Commission as an employee covered by the civil service, had his rights, and in the witness' opinion was fulfilling his duties; that the Govenor insisted whereupon the witness told him that he would talk to Mr. Romero and inform him of the desires of the Governor and that he would communicate to the latter the decision of the officer; that Mr. Romero was a competent official whose services were indispensable to the Commission.

In view of the evidence heard, which has not been contradicted, we doubt very much that Governor Robert H. Gore ordered the abolition of the position of the petitioner for reasons of economy. At the conference in which the Governor requested Mr. Muñoz to ask for the resignation of

Mr. Romero the argument of economy was not mentioned. In the interview had with Mr. Delgado the Governor manifested surprise that the resignation of Mr. Romero should not have been asked for and insisted that this be done, but he made no mention of the other engineer whose office also appears to have been abolished in the subsequent letter from the Governor. In neither of these conferences was there anything said regarding the abolition of any office. A resignation is always insisted upon. The economic reason is not mentioned in any manner. On the contrary, at the time the Governor spoke to Mr. Muñoz he told the latter that there were in the Commission two Liberal engineers and that he did not want a single Liberal in it and he forthwith urged that Mr. Romero be requested to resign. At no time did respondent Robert H. Gore speak of abolishing the offices of engineers in the Commission. His attention was fixed upon Romero. In his letter the Governor dismisses the thought of the resignation and adopts his radical measure of abolishing the position of engineer in the Commission. If the motive of economy had played any part in the conduct of the Governor, it is natural that it should have manifested itself somehow during the conferences which preceded the letter in question. On the contrary, far from suggesting the economic reason as the ground for his action, the Governor exclusively demanded and insisted upon the resignation of Mr. Romero. We do not think that the Governor relied upon any measure of public interest for ordering the abolition of the office filled by the petitioner. The evidence adduced tends to demonstrate that the Governor acted in this case moved by political and not by economic reasons and that good faith was absent when the abolition of the office held by the petitioner was ordered.

The evidence for the petitioner shows that Mr. Romero is an engineer who graduated from the Massachusetts Institute of Technology many years ago; that he pursued his studies under scholarships which he had won in hard con-

414

tests; that he passed the civil service examinations as number 1 on the list of eligibles; and that he has diligently discharged his duties. Both Mr. Muñoz and Mr. Delgado praise highly the competence of this official. We are of opinion that the petitioner has been removed arbitrarily from his office, which has not been lawfully abolished, and that he should be reinstated therein.

Mr. Manuel Font Jiménez, eletrical engineer in the Public Service Commission, has filed in this court a petition in mandamus which is identical with that filed by Mr. Romero, by reason of his having been removed from his office in pursuance of the letter addressed by Governor Robert H. Gore to the President pro tempore of said Commission, Eugenio D. Delgado, wherein the abolition of the office filled by Mr. Font was also ordered. Both these suits should be decided in accordance with the grounds stated in this opinion and separate judgments rendered therein containing the same pronouncements.

Let the judgments above referred to be entered accordingly and a peremptory writ of mandamus issued in each case commanding the reinstatement of the petitioners in their respective positions.