Antonio Romero Moreno, peticionario, *v.* Robert H. Gore, Eugenio Delgado, Blanton Winship y Miguel A. Muñoz, demandados.

No. 287.—*Sometido:* Diciembre 11, 1933. *Resuelto:* Marzo 29, 1934.

*Guerra-Mondragón & Soldevila,* abogados de los peticionarios; *Hon. Procurador General Benjamin J. Horton y Tomás Torres Pérez, Subprocurador,* abogados de los demandados.

El Juez Asociado Señor Córdova Dávila, emitió la opinión del tribunal.

Se solicita en este caso la expedición de un auto de *mandamus* ordenando la reposición del peticionario en el cargo de ingeniero de la Comisión de Servicio Público, del cual, según se alega, ha sido arbitrariamente separado. Cuando

se desarrollaron los sucesos que se relacionan en la solicitud,. ejercía las funciones de Gobernador de Puerto Rico el Hon. Robert H. ·Gore, siendo presidente interino de la Comisión de Servicio Público el Sr. Eugenio D. Delgado. Habiendo cesado estos dos funcionarios en el desempeño de sus cargos, el pleito ha seguido tramitándose, a solicitud de parte, en tanto en cuanto interesa la reposición ·del peticionario, contra el Gobernador Blanton Winship y el presidente efectivo de la Comisión de Servicio Público Miguel A. Muñoz.

Se alega que el peticionario, Antonio Romero Moreno, pertenece al Servicio Civil de Puerto Rico desde el 10 de septiembre de 1917, y que está comprendido en el servicio clasificado por nombramiento de ingeniero extendido por la Comisión de Servicio Público en primero de julio de 1921. El cargo mencionado tiene un haber anual de $3,800 y está autorizado y provisto por la Asamblea Legislativa de Puerto Rico en su Ley No. 59 de 1933, titulada ''Ley fijando el presupuesto de los gastos ordinarios necesarios para el sostenimiento del Gobierno de Puerto Rico durante el año económico que terminará el 30 de junio de 1934.''

En 18 de octubre de 1933 el peticionario recibió la carta que a continuación se transcribe:

''Sr. Antonio S. Romero, Ingeniero,
Comisión de Servicio Público,
San Juan, P. R.
Estimado Sr. Romero:

El Gobernador de Puerto Rico ha dirigido al Presidente de la Comisión de Servicio Público con fecha 16 del corriente una carta que dice así:

'Estoy interesado en reducir en todo lo posible cualquiera y todo gasto que no sea absolutamente esencial para el desenvolvimiento adecuado de los negocios gubernativos.

'Como cuestión de economía administrativa considero necesario abolir los cargos de ingenieros de la Comisión de Servicio Público y en lo sucesivo esta labor será realizada por ingenieros del Departamento del Interior.

'Por consiguiente queda usted notificado de que para tener efecto en noviembre primero todo trabajo de ingeniería requerido por la

Comisión de Servicio Público será asignado al Departamento del Interior, eliminando de esta suerte la necesidad de emplear ingenieros por la Comisión de Servicio Público y por la presente se le ordena eliminar en esa fecha los siguientes cargos en el presupuesto de la Comisión de Servicio Público:

1 ingeniero _____ $3, 800
1 ingeniero (electricista) _____ 2, 700.'

Como es usted uno de los ingenieros mencionados en dicha carta, sirve ésta para notificarle que en y después de noviembre primero su cargo quedará abolido y sus servicios no se requerirán por más tiempo.

Véome obligado a esto cumpliendo las instrucciones contenidas en la carta del Gobernador arriba transcrita.

Atentamente,

(Fdo.)     EUGENIO D. DELGADO,
*Presidente Pro-Tempore.''*

Se alega que la acción y medida adoptadas por el demandado Robert H. Gore aboliendo de una manera ilegal, injusta y arbitraria el cargo mencionado, monta a la destitución y separación del peticionario y se deben a un plan preconcebido, preanunciado públicamente y puesto en práctica más tarde por Robert H. Gore, bien personalmente o ya por medio de los distintos jefes de departamentos, de destituir de sus cargos a todos los funcionarios y empleados que pertenezcan al partido político del cual es miembro el peticionario.

Esta corte, previa audiencia de las partes interesadas, expidió un auto condicional de *mandamus* contra los demandados, quienes expusieron las causas que a su juicio debían eximirlos de responsabilidad en las vistas celebradas ante este tribunal, en 11 y 12 de diciembre de 1933. Practicada la prueba ofrecida por ambas partes, el caso quedó sometido a nuestra consideración mediante argumentación escrita.

Tres son las cuestiones fundamentales que a primera vista surgen de las alegaciones y la prueba en la consideración del presente caso. La primera gira sobre la facultad del Gobernador para transferir o destinar un negociado o cargo del Gobierno Insular a cualquier departamento del mismo estando en receso el Senado; la segunda sobre si la facultad

de transferir o asignar envuelve también la de abolir; y la tercera sobre si la mala fe atribuída al Gobernador al decretar la abolición del cargo del peticionario ha quedado o no establecida por la prueba.

■ No atacan los demandados directamente el principio de que el Gobernador, cuando actúa fuera de la órbita de sus atribuciones, violando un derecho privado, cae dentro de la jurisdicción de los tribunales, a los cuales incumbe el deber de proteger ese derecho; pero se discute extensamente esta cuestión por el peticionario en su alegato y parece ponerse en tela de juicio por los demandados. Esta corte ha decidido, en el caso de *Lutz* v. *Post,* 14 D.P.R. 860, que procede expedir un auto de *mandamus* contra el Gobernador en casos adecuados, y esta doctrina ha sido ratificada en *Jiménez* v. *Riley,* 30 D.P.R. 626. Por más que esta cuestión es cosa resuelta entre nosotros, vamos a permitirnos copiar de la opinión emitida por la Corte Suprema de Wisconsin en el caso de *Ekern* v. *McGovern,* 142 N. W. 597, ciertos párrafos que, si bien no discuten específicamente la procedencia o improcedencia de un auto de *mandamus* contra el jefe del poder ejecutivo, aplican principios de carácter general sobre la jurisdicción de los tribunales en aquellos casos en que el Gobernador, salvando las fronteras de la ley, penetra arbitrariamente en el campo de la ilegalidad. En el caso resuelto por la Corte Suprema de Wisconsin, el Gobernador destituyó festinadamente a un alto funcionario sin concederle un tiempo razonable para establecer su defensa, y nombró su sucesor. No abandonó el funcionario destituído las funciones de su cargo. Comoquiera que la persona nombrada por el Gobernador intentara penetrar violentamente en la oficina para tomar posesión, se solicitó y obtuvo de la corte un auto impidiendo que el funcionario destituído fuese molestado violentamente en la posesión de su cargo. Los abogados de ambas partes discutieron ampliamente la cuestión planteada. La Corte Suprema de Wisconsin emitió una opinión vigorosa, plena de lucidez y sabiduría, que se distingue y recomienda

por la pureza de sus principios, y que discute con amplitud de miras, vertiendo conceptos luminosos, las atribuciones de los tribunales para proteger los derechos de todos los ciudadanos, cuando hayan sido infringidos sin parar mientes en la posición oficial de la persona culpable de la infracción. De la opinión emitida por la corte en el referido caso copiamos lo siguiente:

"En lo que antecede, según lo hemos expuesto suficientemente, no se duda que el Gobernador, mientras actúa dentro de la esfera de sus atribuciones, está fuera del alcance de los tribunales, pero una infracción de derechos privados, repetimos, no cae dentro de esa esfera, y cuando se realiza por virtud de un acto de él o de sus agentes, la parte agraviada puede acudir a los tribunales de su país a recabar justicia.

"Según se dijo por esta corte en Attorney General v. Barstow, 4 Wisc. 742, mientras la corte meramente actúe 'en el cumplimiento del deber que le corresponde de determinar y deslindar los derechos de las partes, y no de crear estos derechos, debe proseguir hasta dictar sentencia, no importa cuán desagradable y delicado sea ese deber, e independientemente de cualquiera y todas las consecuencias que resulten de su actuación constitucional . . . Debemos ocupar con firmeza nuestros puestos de confianza pública, hasta que la Constitución caiga a nuestro derredor en ruinas.' Esas palabras, reveladoras de un elevado concepto del deber judicial y del valor para cumplirlo, muy bien podrían repetirse con énfasis después del transcurso de más de medio siglo en la historia de esta corte. La idea tan elocuentemente expresada por el Juez Asociado Sr. Cole en aquellos días lejanos, y en aquella ocasión memorable en la administración del tribunal, no priva menos ahora que entonces. No obstante los ataques de que fué objeto para aquella época, o después, o que se le hacen ahora, a base de la teoría de una especie de autoridad regia investida en el departamento ejecutivo, que faculta a la persona que está en él para infringir la ley y colocarse a tal altura por sobre la agencia que tiene el pueblo para remediar e impedir injusticias mediante la aplicación de la ley, que cualquiera tentativa de poner en duda sus actos por tal agencia sería usurpadora—no ha estado ni está ahora en mayor peligro que 'una estrella en el vientre de las nubes.' Se funda en la soberanía del pueblo, vivificada por la designación constitucional del departamento judicial para vindicarla.

"¿Cómo puede uno estar familiarizado con el caso y dudar, por un momento siquiera, que el Gobernador, como un violador de la ley, se halla en el mismo plano que un individuo cualquiera? Argumentos en contrario similares a los que hemos oído en este caso fueron aducidos entonces con una lógica, elocuencia y vigor hasta allí sin parangón en esta corte, y no igualados después. Ahí está el expediente, una fuente inagotable de sabiduría sobre el tema discutido. Todos los miembros del foro comprendieron que estaban empeñados en una contienda que habría de fijar de una vez y para siempre los principios fundamentales de nuestro sistema de gobierno: fijarlos de manera que quedaran libres de trabas a causa de cualquiera noción falsa que prevaleciese en otras partes, bajo el concepto erróneo de que los sistemas extranjeros ofrecían un ejemplo de la misma. Ellos se acercaron tanto al momento y a las circunstancias en que se originaron esos principios, que no había necesidad de buscar precedentes. En realidad, no los había. Estaban familiarizados con el sistema de los antiguos. Sabían que el propósito de los arquitectos de nuestro sistema era desplazar aquél. A la luz de ese propósito monumental, y con la experiencia que los mismos expositores oficiales obtuvieron al hacer nuestra Constitución, se forjó y estableció un resultado que nadie precisa interpretar erróneamente.

"¡Cómo crecen los sentimientos que provocaron y caracterizaron el resultado final del caso de Bashford v. Barstow, a medida que los meditamos, y cómo llenan el alma de admiración hacia nuestra forma de gobierno y de gratitud hacia aquéllos que colocaron sus principios predominantes sobre una base tan sólida! Algunos de esos sentimientos, tal como fueron expuestos en aquella época, muy bien pueden repetirse aquí como la mejor expresión de nuestras propias ideas.
"" *       *       *       *       *       *       *

"Es algo extraño que, no obstante la verdadera lógica del cambio efectuado por la declaración de independencia de nuestro país, y del conflicto airoso que sostuvimos, los tribunales algunas veces parecen no haber comprendido que fué la independencia de un sistema de gobierno caracterizado por la posesión individual de meros privilegios emanados de un soberano personal, la que se declaró y por la que se luchó y se ganó entre el humo y el estrépito de la batalla y mediante el sacrificio de sangre y hacienda—la sustitución del viejo sistema por uno basado en derechos individuales inherentes, que nada reconoce por vía de autoridad soberana que la inherente en el pueblo y la que ésta pueda delegar para coordinar los departamentos en la forma que el pueblo crea conveniente, amén de las restricciones y garantías constitucionales.

"A pesar de que la luz de la vieja noción de una soberanía personal y del sistema en que ella se basaba se apagó en la lucha que caracterizó el nacimiento del nuevo sistema en nuestras playas, el que surgió con todos sus indecibles beneficios de las cenizas del antiguo, como la bella flor de las cenizas de Jacinto, desde entonces ha invadido el país y está extendiendo rápidamente sus beneficios a todo el género humano, el viejo sistema como el fantasma de Banquo aparece de vez en cuando, cual si fuera llamado por conjuro de la tendencia humana—producto de la herencia que retrocede a todas las edades—de doblar la cerviz ante la encarnación de la soberanía personal. Sería muy de lamentarse que ese falso concepto hallara sitio en nuestra jurisprudencia, después de su vieja y enfática repudiación y de las confirmaciones frecuentes de tal repudiación.

"En este punto, no dejaremos de referirnos a la expresión personal de duda que se hizo en el caso de State v. Rusk, 55 Wisc. 465, 479, 13 N.W. 452, respecto a la competencia de la corte para enviar su mandato al gobernador de un estado o para revisar sus actos en alguna forma. Pero no fué ésa una manifestación autorizada. Fué un reparo hecho meramente de paso, completamente personal, y, según nos vemos obligados a juzgarlo, bastante irreflexivo. Procede que se le elimine expresamente todo viso de decisión judicial.

"No debe entenderse que hemos omitido considerar el hecho de que se debe mucha deferencia a la rama coordinada del régimen representada por el Gobernador. Es el placer y el deber de los tribunales tener esa deferencia, y, tal vez, resolver dudas razonables en torno al punto donde termina la mera deferencia, a favor del departamento ejecutivo. Pero el tribunal no debe ir al extremo de arrojar duda alguna sobre su propia autoridad para habérselas con todas las cuestiones judiciales, no importa que ello pueda necesariamente poner a prueba algún acto del Gobernador. Puede muy bien titubear y aun negarse a usar su autoridad en una forma coercitiva en cuanto a él cuando hay alguna discreción para hacerlo así, pero no debe cometer el atrevimiento de dudar que tenga la facultad de actuar cuando ello sea menester. Nadie puede decir cuán pronto se puede hacer necesario actuar para detener la mano que pudiera perpetrar los males más serios, como sucedió en el caso de Attorney General v. Barstow.

"Algunas cortes han dado la débil excusa para dudar respecto a su derecho a enviar un mandato a un gobernador que directa o indirectamente ponga en tela de juicio algún acto ejecutivo suyo, que la corte sería impotente para hacer que se le obedeciera—hasta insi-

nuando la posibilidad que habría que contender con las fuerzas militares bajo el dominio del gobierno; como si una corte con conocimiento de su autoridad constitucional estuviese justificada, bajo cualesquiera circunstancias, para no hacer uso de ella, meramente porque la persona contra quien, a no ser por eso, se dictaría sentencia, aunque fuese el más alto representativo de la ley, podría, por ejemplo, cometer el delito de traicionarla, antes que someterse a la autoridad debidamente constituída. Esta corte jamás ha reconocido la existencia de falta de poder para hacer cumplir sus decretos o de falta de valentía para vindicarlo.

"Jueces de gran eminencia y los más eruditos tratadistas se han pronunciado en forma similar a la anterior. El Juez Field, como portavoz de la corte en el caso de McCauley v. Brooks, 16 Cal. 39, dijo: 'Nada hay en esta distribución de poderes que coloque a uno u otro departamento por encima de la ley o que haga al uno independiente del otro . . . La independencia absoluta no existe.' Y más adelante manifestó, en síntesis, que cuando se le da poder a un departamento, es de implicarse que hay independencia dentro de la esfera de ese poder. Si se extralimita, la judicatura vindicará el derecho conculcado.

"Como un ejemplo adicional de las muchas ilustraciones que de lo que se ha dicho contienen los libros, véase lo que manifestó el Juez Asociado Sr. Valentine como ponente en el caso de Martin v. Ingham, 38 Kan. 641, 17 Pac. 162, al interpretar nuestro sistema constitucional:

" 'No hay precepto expreso en nuestra Constitución ni en estatuto alguno, que exima a un empleado del departamento ejecutivo, ya sea jefe o pertenezca a otra categoría, de ser demandado ante un tribunal, . . . y si alguno de esos funcionarios está exento . . . debe ser por virtud de algunas implicaciones desconocidas u ocultas de la Constitución o los estatutos, o a causa de algunas barreras inherentes e insuperables fundadas en la estructura del Gobierno mismo . . . En todos los demás casos no es el rango o el carácter del funcionario, sino la naturaleza de la cosa a ser hecha, lo que rige. Ningún otro funcionario está por encima de la ley . . . Los distintos departamentos del gobierno no son independientes entre sí . . . Se ha dicho que si el gobernador se opone a una orden o sentencia de la corte, no se puede hacer cumplir . . . Pero, ¿han de anticipar los tribunales que el Gobernador no cumplirá con su deber? . . . Nadie debe suponer que él dejará de cumplir con su deber . . . Ningún departamento debe abandonar el desempeño de sus funciones

por temor a que algún otro departamento pueda hacer que sus actos sean nugatorios . . . Cada uno de los distintos departamentos . . . es superior a los otros en algunos respectos . . . Cada departamento es supremo en su propia esfera. Pero, fuera de su propia esfera, es débil y debe obedecer.'

''Las cortes que resuelven en forma contraria a esto, según han dicho algunos tratadistas, lo hacen sin una base sólida para su conclusión. Proceden así, según hemos indicado, mayormente a base de un concepto erróneo del sistema de que forman parte.''

No termina aquí la Corte Suprema de Wisconsin. La opinión es extensa y no creemos que los párrafos copiados sean superiores a los que hemos omitido. La ley no autoriza al Gobernador para ser arbitrario; antes bien, le impone el deber de obedecerla y la misión de hacerla cumplir. No empece que el Gobernador actúe so color de autoridad. Si sus actuaciones resultan claramente arbitrarias, los tribunales de justicia son los llamados a pronunciar, a solicitud de parte, la última palabra y a reparar el agravio inferido, aunque emane de las más altas esferas gubernativas. Es verdad que esta misión es altamente desagradable, y que los tribunales deben ser parcos y escrupulosos en el ejercicio de sus funciones judiciales, para evitar menoscabar la autoridad del ejecutivo cuando gira dentro del círculo de sus atribuciones; pero la justicia, que no reconoce castas ni jerarquías, debe volver, cuando es necesario, por los fueros del derecho vulnerado, y ecuánime y serena, inflexible y magnánima, extender sus brazos protectores por igual a todos los ciudadanos, lo mismo al humilde que al poderoso, al que viste una modesta blusa que al que ostenta la clámide de una elevada magistratura. Como dice el tribunal de Wisconsin, ningún funcionario es tan alto que esté por encima de la ley ni tan bajo que no esté protegido por sus disposiciones.

Refiriéndose a los debates en el caso de *Attorney General ex rel. Bashford* v. *Barstow,* 4 Wis. 742, comentado en los párrafos de la opinión que hemos transcrito, dice el mencionado tribunal:

"Con inevitable poder de lógica la posición de la magistratura en nuestro sistema y la importancia de mantenerla, fueron puestas de relieve ante la corte para ayudarla en todo lo posible a resolver la controversia, en estas inspiradas palabras emanadas del foro: 'Cuando el descontento, la violencia y la anarquía sucedan a la ley y al orden, y el pueblo y los funcionarios públicos se aparten de la constitución y abandonen la nave del estado, yo tengo esperanza de que la última mirada que pueda recogerse de un gobierno organizado sea la de la judicatura, que se vea que las cortes, en tanto en cuanto quede algún vestigio de la nave del estado, están listas para decidir, interpretando el derecho con mente equitativa, distribuyendo la justicia con absoluta igualdad, permaneciendo serenas e impertérritas ante la influencia del temor y de la facción, y obedientes a aquella máxima tan peculiarmente suya: *Fiat justitia, ruat coelum'.*"

Esta elocuente invocación a la justicia, donde la belleza de la expresión corre parejas con los elevados sentimientos que la inspiran, se amplifica y complementa con las siguientes frases lapidarias de la misma corte de Wisconsin:

"Para terminar deseamos hacer la observación de que en ningún momento hemos olvidado la consideración que esta corte debe tener para el alto cargo de Gobernador. Tenemos un deber solemne a ese respecto. Es cuestión de gran delicadeza considerar las actuaciones del Gobernador y declararlas nulas. Mas cuando el deber lo exige, éste habrá de cumplirse. Quienquiera que vacile cuando el deber es claro, debido a la alta esfera del departamento coordinado del gobierno, no es acreedor a estar investido del poder judicial otorgádole por el pueblo. Con la debida deferencia al departamento coordinado y apreciando plenamente su independencia dentro de la esfera de su autoridad, debemos, con el valor que ha de caracterizar la suprema autoridad judicial, vindicar la autoridad máxima aquí envuelta y determinar cuál es la ley, qué actos constituyen una infracción de la misma, y cuáles son sus consecuencias legales. En el momento que se establezca que cualquiera de los otros departamentos es independiente del judicial a ese respecto, el freno que el pueblo puso en la Constitución para defender los derechos privados habrá sido pisoteado y el camino hacia la usurpación quedará claro y expedito. No hemos pensado siquiera que fuese el propósito del Gobernador infringir la ley. Como humano que es puede errar. Con frecuencia ocurren errores, como sucedió aquí, sin consciencia de cualquier influencia ulterior, y sin embargo algún sentimiento fuerte

proveniente de provocación puede haber preparado el campo en tal forma que subvierta el raciocinio.''

La cuestión de si el Gobernador tiene o no facultades para transferir o destinar un negociado o cargo a cualquier departamento, estando en receso el Senado Insular, merece preferente atención. El artículo 53 de nuestra Carta Orgánica dice así:

"El Gobernador, con la aprobación del Senado de Puerto Rico, podrá transferir o destinar a cualquier departamento cualquier negociado u oficina que pertenezca a alguno de los departamentos regulares del Gobierno, o que en lo sucesivo se cree, o que no esté asignado a ningún departamento.''

Entienden los demandados que el Gobernador en este caso debe tener los mismos poderes que ejercita para cubrir vacantes mediante nombramientos cuando el Senado está en receso. Los demandados parecen partir de la base de que el Gobernador tiene el poder de cubrir las vacantes que ocurren mientras esté en receso el Senado, en ausencia de una disposición de la ley concediéndole esta autoridad. Ignoramos si esta cuestión ha sido decidida por los tribunales de justicia. Sabemos cuáles fueron las causas que originaron la facultad concedida por la Constitución nacional al Presidente para cubrir vacantes durante el receso del Senado. Esta cláusula no figuró en el primer proyecto de constitución, pero se insertó después por medio de una enmienda, aparentemente sin objeción.

Con respecto a esta facultad concedida al Presidente, dice Story en el tomo 2, párrafo 1557, pág. 380, de su obra sobre ''Constitution'':

"La conveniencia de esta concesión es tan obvia que no requiere discusión. No había más que uno de dos caminos a elegir: o el Senado se mantenía constantemente en sesión con el fin de poder confirmar los nombramientos de los funcionarios, o se autorizaba al Presidente a hacer nombramientos interinos durante el receso que expirarían cuando el Senado tuviese una oportunidad de actuar en el asunto. El primer curso hubiese sido demasiado molestoso para

el Senado y costoso para el pueblo. En el último se combinan la conveniencia, la prontitud de acción y la seguridad general.''

Watson, en el tomo 2, pág. 993 de su obra sobre ''Constitution'', dice:

" 'Pero fué obvio que sin una disposición sobre nombramientos temporales para cubrir vacantes que pudiesen ocurrir mientras el Senado se viese privado de participar en los nombramientos por no estar en sesión, se derivaría una grave inconveniencia y daño al interés público. Para allanar esta dificultad y por consentimiento común, se dispuso ''que el Presidente tendría poder para cubrir todas las vacantes que pudiesen ocurrir durante el receso del Senado, expidiendo nombramientos que expirarían al final de la próxima sesión de dicho cuerpo legislativo.'' Esto es esencialmente un *proviso* a la disposición relativa a nombramientos con el consejo y consentimiento del Senado. Fué cuidadosamente redactado para cumplir el propósito que se tenía en mente, sin cambiar en el más mínimo grado el espíritu de la constitución de que tales nombramientos deben únicamente hacerse con la participación del Senado. Su solo propósito fué hacer factible que en cualquier tiempo hubiera, estando el Senado en sesión o no, un funcionario para cada cargo con derecho a desempeñar las funciones del mismo . . .' ''

La enmienda introducida al proyecto original (*first draft*) de la Constitución demuestra que los autores de este histórico documento no creyeron que el poder concedido al Presidente de nominar y nombrar funcionarios con el consentimiento del Senado le daba autoridad para cubrir las vacantes que ocurrieran durante el receso de dicho cuerpo legislativo. Si así lo hubieran creído no habrían añadido una disposición adicional para cubrir la laguna que se advertía en el proyecto original. No sabemos ni creemos que exista ningún estado donde el poder de cubrir vacantes durante el receso del Senado no haya sido concedido por la ley. Las autoridades y las decisiones que hemos consultado sobre esta cuestión siempre hacen referencia a alguna disposición concediendo al ejecutivo la facultad de cubrir las vacantes cuando el Senado no esté en sesión. En Puerto Rico los nombramientos que hace el Gobernador con el consentimiento del

Senado están autorizados por leyes especiales y por el artículo 167 del Código Político. El artículo 26 de nuestra Ley Orgánica dispone que los nombramientos hechos mientras el Senado no esté en sesión tendrán efectividad hasta que sean desaprobados o hasta que el Senado declare terminado su próximo período de sesiones.

No citan los demandados ningún precedente que tienda a demostrar que el Gobernador esté autorizado para cubrir las vacantes que ocurran cuando el Senado no esté en sesión. Este argumento, lejos de favorecer a los demandados, debilita su posición, ya que no han demostrado que el ejecutivo tenga la facultad implícita de cubrir vacantes durante el receso del Senado, derivada de la facultad de nombrar. En nuestro sentir el Gobernador no puede ejercer la autoridad que le concede el artículo 53 de nuestra Carta Orgánica, prescindiendo del consentimiento del Senado Insular. Es necesario que se preste este consentimiento para que surtan efecto las transferencias o asignaciones permitidas por la ley.

La segunda cuestión a decidir es si la facultad concedida al Gobernador para transferir o asignar un negociado o cargo a cualquier departamento del gobierno incluye también la facultad de abolir estas agencias de la administración con o sin el consentimiento del Senado. Si no puede transferir es claro que tampoco puede abolir. La abolición de un cargo implica su desaparición, su inexistencia completa, su destrucción. Aun asumiendo únicamente para los efectos de la argumentación que el Gobernador tiene la facultad implícita de cubrir vacantes durante el receso del Senado, sin que así lo disponga la ley, habría que forzar el argumento y violentar los cánones de la interpretación judicial para llegar a la conclusión de que el artículo 53 de nuestra Carta Orgánica autoriza implícitamente la abolición de un cargo y que esta autorización se extiende al período en que no está el Senado en sesión. Cuando se cubre una vacante el Gobernador no destruye derechos, más bien los crea, y nada se pierde con esperar la sesión regular del Senado para aprobar o des-

aprobar el nombramiento; pero cuando la actuación del ejecutivo surte el efecto de privar a un funcionario de su empleo, los derechos de este funcionario no deben quedar en la incertidumbre pendientes de que el Senado apruebe o no, en su sesión ordinaria, lo que haya hecho el Gobernador. Opinamos que el Gobernador no puede decretar la abolición de un cargo, sobre todo estando el Senado en receso, pues si no tiene esta facultad para realizar una transferencia durante este período, menos puede tenerla para ejecutar un acto de mucha más transcendencia como es la abolición.

En su carta al Presidente de la Comisión de Servicio Público, Robert H. Gore dice que como cuestión de economía administrativa considera necesario abolir los cargos de ingenieros de la Comisión de Servicio Público y ordena al funcionario aludido que elimine los salarios de los dos cargos mencionados del presupuesto de la Comisión de Servicio Público. Hemos visto que el Gobernador puede transferir o asignar a cualquier departamento todo un negociado (*bureau*) o cargo (*office*).

Blackstone define la palabra *office* como un derecho a ejercer una función pública o empleo, y a recibir los honorarios y emolumentos pertenecientes al mismo. En la página 25 de su obra "Public Officers and the De Facto Doctrine", dice el Juez Albert Constentineau:

"Las definiciones americanas son excesivamente numerosas y variadas en su lenguaje, aunque como una regla no difieren grandemente unas de otras en sustancia. '*An office*', dice el Juez Presidente Marshall, 'se define como un cargo público o empleo y aquél que ejecuta los deberes del cargo es un funcionario'.

"Según ha sido definido por la Corte de Apelaciones de Nueva York, un cargo público (*public office*) es 'un fideicomiso permanente que debe ser ejercido en favor del gobierno o de todos los ciudadanos que puedan necesitar la intervención de un oficial o funcionario público, en todas las materias dentro de la esfera de los deberes pertenecientes al carácter del fideicomiso. Implica un derecho a ejercer generalmente, y en todos los casos adecuados, la función de un fideicomiso público o empleo, y a recibir los honorarios y emolumen-

tos correspondientes y a mantener la posición y ejecutar el deber por el término y la tenencia prescritos por la ley.' Se ha dicho además que un cargo público (*public office*) es 'una agencia del estado, y la persona encargada de los deberes de esta agencia es un funcionario público'.''

La comunicación autorizada por el Gobernador suprime los cargos de ingeniero de la Comisión de Servicio Público y ordena que el trabajo de éstos sea realizado en lo sucesivo por ingenieros del Departamento del Interior. De manera que el cargo desaparece, quedando en pie los servicios, que es lo único que resulta transferido. No tiene la orden del Gobernador el efecto de transferir o eliminar la oficina o recinto donde el peticionario tiene su escritorio, anaqueles y libros de consulta. La orden elimina el cargo, lo destruye, y únicamente transfiere los servicios anexos al mismo. No creemos que la intención del Congreso haya sido conceder al Gobernador la facultad de abolir todo un *bureau* o cargo (*office*), al autorizarlo para hacer transferencias. No podemos llegar a la conclusión de que sea ésta una facultad implícita en la facultad de transferir. La Legislatura, desde luego, puede autorizar al ejecutivo para que decrete la abolición de un cargo, y es regla general que los organismos que crean cargos públicos tienen también la facultad de abolirlos; pero siendo la Legislatura la fuente de todos estos poderes, a ella hay que acudir para ver si en un caso determinado la facultad que se invoca emana de alguna disposición legislativa.

■■■■ Se atribuye por último al Gobernador un plan preconcebido de destituir a todos los funcionarios y empleados pertenecientes al partido del cual es miembro el peticionario, quien está afiliado al Partido Liberal. Es un hecho admitido por las partes que el Sr. Romero pertenece al Servicio Civil Clasificado. De acuerdo con la sección 6 de la Ley de Servicio Civil, aprobada en 1931, el peticionario únicamente puede ser separado de su cargo de conformidad con lo dispuesto en la ley. Ninguna persona que ocupe una plaza

o destino en el Servicio Civil Clasificado será separado o despedido, salvo por causas justificadas y previa formulación de cargos, y no antes de dársele oportunidad para ser oído en defensa propia. La ley dispone la reposición de un funcionario o empleado separado en caso de que previa audiencia, resultare que la separación se debió a razones de orden político o religioso.

El inciso 18 de la sección 2ª. de nuestra Carta Orgánica dispone que no exigirá como condición para desempeñar cualquier cargo o posición de confianza en el Gobierno de Puerto Rico, ningún otro requisito político o religioso que un juramento de defender la Constitución de los Estados Unidos y las leyes de Puerto Rico.

Es claro que si no puede exigirse ningún requisito político o religioso para desempeñar un cargo, tampoco puede separarse del mismo a la persona que lo desempeña por razón de sus ideas religiosas o políticas. En el presente caso no aparece el Gobernador destituyendo al peticionario de su cargo, sino decretando la abolición del mismo; pero se alega que esta abolición se debió a un plan preconcebido de destituir a todos los funcionarios pertenecientes al partido en que milita el Sr. Romero. Claro está que si la actuación del ejecutivo en vez de inspirarse en una razón de economía, como se alega en la carta dirigida al Presidente de la Comisión de Servicio Público, obedeció a otras razones con el propósito de separar de su cargo al peticionario, entonces esta abolición no monta a otra cosa que a la realización del propósito de la destitución.

En el caso de *Gil v. Chardón*, 41 D.P.R. 217, esta Corte, por conducto del Juez Presidente Sr. del Toro, dijo:

"La tendencia moderna, y la más justa, y el espíritu de la ley creadora del servicio civil, son garantizar la eficiencia del trabajo público, formando y sosteniendo un cuerpo de empleados competente, laborioso y honrado que no esté sujeto a los cambios, veleidades o apasionamientos políticos, o a la mala voluntad, el despotismo, o las miras interesadas de los jefes, sino que dependa de sí mismo, de su

propia conducta en el ejercicio de sus funciones. Cumplir con el deber, tal es la norma del empleado; y si lo cumple, considerarse en su posición seguro, tal la garantía de la ley, que si se viola será restablecida por los tribunales de justicia.''

Examinemos ahora la evidencia aportada por el peticionario para probar su alegación de que el Gobernador actuó movido por razones de carácter político. Se inicia la prueba con un telegrama dirigido al Hon. Robert H. Gore, por el Presidente del Partido Liberal, Antonio R. Barceló. En este mensaje el Sr. Barceló retira una lista de nombres que sometiera al Gobernador para ser considerada en relación con los nombramientos de jefes de departamentos, alegando, como razón para retirar dicha lista, que se había publicado en la prensa una declaración del Gobernador, al efecto de que pediría a los miembros de su gabinete nombrados por él, la presentación de antemano de la renuncia con la fecha en blanco, y añadiendo que ningún puertorriqueño de altura y prestigio podría aceptar un cargo bajo tales condiciones. En su contestación a este mensaje el Gobernador ofrece cumplir con los deseos del Sr. Barceló, diciendo que ni él ni los miembros del Partido Liberal podrán quejarse por la obediencia estricta a sus deseos, y añadiendo que supone que el Sr. Barceló no desea retener los puestos que están ahora en manos de liberales. Termina el Gobernador diciendo que la participación en el Gobierno que hubiera sido compartida con el partido Liberal se ofrecerá al partido Demócrata.

El testigo Arturo de la Cruz Calderón, repórter del periódico ''La Democracia'', declara que una tarde, durante una entrevista que dió a la Prensa el Gobernador, refiriéndose al mensaje que le envió el Sr. Barceló retirando los nombres de los candidatos liberales que constaban en la lista que le había enviado, el referido Gobernador dijo que los primeros que debían renunciar sus puestos en el Gobierno eran su yerno, aludiendo al Sr. Romero, yerno del Sr. Barceló, y el Sr. Font, por considerarlos liberales; que si ésa era la manera de pensar de los liberales respecto a las renuncias en

blanco, que si ésa era la manera de pensar del Sr. Barceló, debían renunciar el Sr. Romero y el Sr. Font, a lo que uno de los que estaban presentes contestó que el Sr. Font y el Sr. Romero no debían renunciar porque no debían su nombramiento al Gobernador ni formaban parte del gabinete.

El Sr. Miguel Muñoz, Presidente de la Comisión de Servicio Público, declaró que en una ocasión en que fué a ver al Gobernador para solicitar una licencia y pedirle permiso para ausentarse para los Estados Unidos, dicho funcionario le dijo: "En la Comisión tienen Uds. dos ingenieros liberales. Yo quiero que no haya uno que sea liberal. Quiero que Ud. le pida la renuncia a Romero." Declara el Sr. Muñoz que se negó a complacerle, diciendo que no se podía pedir la renuncia al Sr. Romero, quien estaba dentro del Servicio Civil, que tenía catorce o quince años de servicio en la Comisión y que era muy competente, que no había motivos para que la Comisión tuviese que pedirle la renuncia, y que no veía la razón que el Gobernador tuviera para pedirla a Romero, excepto ser yerno del Sr. Barceló. A su regreso de los Estados Unidos el Sr. Muñoz visitó al Gobernador para pedirle la reconsideración de la orden aboliendo los cargos de ingenieros de la Comisión. Estaba presente el Sr. Saldaña. El Gobernador le dijo: "Ud. recordará que le hablé del asunto de los ingenieros." El Sr. Muñoz le contestó: "No, Ud. no me trató el asunto de los ingenieros, Ud. me habló solamente del asunto del Sr. Romero, que había que pedirle la renuncia y yo le manifesté que antes que hacer eso renunciaba."

El Sr. Eugenio Delgado, que actuaba de Presidente interino de la Comisión cuando el Gobernador escribió su carta ordenando la abolición del cargo del peticionario, declara que el Gobernador lo llamó para decirle que le extrañaba que antes de haberse embarcado el Presidente propietario, Sr. Muñoz, le había encargado solicitar la renuncia del Sr. Romero y no lo había hecho; que el Gobernador le llamó para preguntarle si Romero continuaba prestando sus servicios, y al

contestarle que sí, le preguntó si no sabía que él le había pedido a Muñoz que pidiera la renuncia a Romero, contestándole el testigo que nada sabía; que entonces el Gobernador le dijo: "Pues yo necesito que Ud. le pida la renuncia al Sr. Romero"; que el declarante le contestó que era inútil hacerlo, porque el Sr. Romero estaba en la Comisión como un empleado del Servicio Civil, tenía sus derechos y en su concepto estaba cumpliendo con sus deberes; que el Gobernador insistió y entonces el declarante le dijo que hablaría con Romero, informándole de sus deseos, y le contestaría la decisión de este funcionario; que el Sr. Romero es un funcionario competente e indispensable para la Comisión.

En vista de la prueba practicada, que no ha sido contradicha, dudamos mucho de que el Gobernador Robert H. Gore decretara la abolición del cargo del peticionario por razones de economía. En la conferencia en que el Gobernador Gore solicitó del Sr. Muñoz que pidiese la renuncia a Romero no surge el argumento de la economía. En la entrevista celebrada con el Sr. Delgado el Gobernador se extraña de que no se le haya pedido la renuncia a Romero y ratifica su propósito de que así se haga, sin mencionar al otro ingeniero cuyo cargo aparece también abolido en la carta posterior del Gobernador. En ninguna de estas conferencias se habla de abolir cargo alguno. Siempre se insiste en la renuncia. La razón económica no se menciona en ningún sentido. Por el contrario, cuando el Gobernador habla con el Sr. Muñoz, le dice que en la Comisión hay dos ingenieros liberales y quiere que no haya uno que sea liberal, e inmediatamente urge que se le pida la renuncia al Sr. Romero. En ningún momento el demandado Robert H. Gore habla de abolir los cargos de ingenieros de la Comisión. Su atención está fija en Romero. Es en la carta dirigida al Presidente de la Comisión de Servicio Público donde surge por primera vez el argumento de la economía. En esta carta el Gobernador silencia la idea de la renuncia y adopta la medida radical de abolir los cargos de ingenieros de la Comisión. Si el elemento de la eco-

nomía hubiese jugado algún papel en la actuación del Gobernador, es natural que se hubiese manifestado en alguna de estas entrevistas que precedieron a la carta en cuestión. Por el contrario, lejos de surgir la razón económica como elemento básico de la conducta del Gobernador, se solicita y se insiste exclusivamente en la renuncia del Sr. Romero. No creemos que el Gobernador se basara en ninguna medida de interés público para decretar la abolición del cargo del peticionario. La evidencia aportada tiende a demostrar que el Gobernador actuó en este caso movido por razones de índole política y no de carácter económico y que no medió buena fe al decretarse la abolición del cargo del peticionario.

La prueba de los peticionarios revela que el Sr. Romero es un ingeniero graduado en The Massachusetts Institute of Technology hace muchos años, que cursó sus estudios con becas que ganó en empeñada lid, que aprobó los exámenes del servicio civil con el No. 1, y que ha dedicado gran parte de su vida al servicio del gobierno, cumpliendo de una manera diligente con sus deberes. Tanto el Sr. Muñoz como el Sr. Delgado hacen elogios de la competencia de este funcionario. Opinamos que el peticionario ha sido separado arbitrariamente de su cargo, que no ha sido legalmente abolido, y que debe ser repuesto en el mismo.

El Sr. Manuel Font Jiménez, ingeniero electricista de la Comisión de Servicio Público, ha radicado en esta Corte una solicitud de *mandamus* idéntica a la que ha presentado el Sr. Romero, por haber sido separado de su cargo en virtud de la carta dirigida por el Gobernador Robert H. Gore al Presidente interino de dicha Comisión, Sr. Eugenio D. Delgado, aboliendo también el cargo del Sr. Font. Ambos pleitos deben resolverse por los fundamentos aducidos en esta opinión, dictándose en cada caso una sentencia que contenga los mismos pronunciamientos.

*Debe dictarse la sentencia acordada en esta opinión para ambos casos y expedirse auto perentorio de mandamus ordenando la reposición en sus cargos de los interesados.*